UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


ALLEN MARK AJAN                    )
           Petitioner,             )
                                   )
v.                                 )          NO. 2:02-CR-71
                                   )          (NO: 2:06-CV-24)
UNITED STATES OF AMERICA           )          Judge Greer
           Respondent              )


## <u>MEMORANDUM OPINION</u>

On January 30, 2006, Allen Mark Ajan ("Petitioner" or "Ajan"), a federal

prisoner, filed a "Petition Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct

Sentence By A Person In Federal Custody." [Doc. 273]. Attached to the petition was

a letter in which petitioner sought additional time within which to file a memorandum

in support of his petition. [Doc. 273-1]. On March 3, 2006, Ajan filed a "Motion to

Amend § 2255 Pursuant To Rule 12 of Rules Governing § 2255 Cases And Fed. R.

Civ. P. 15(a)" and a 32 page memorandum in support of his original petition in which

he seeks an evidentiary hearing. [Doc. 277]   The United States responded in

opposition to the petition on October 17, 2007, [Doc. 310] and the petitioner filed a

"Motion to Supplement § 2255 Motion", along with two supporting affidavits,  on

October 22, 2007. [Doc. 273].[1]  On February 6, 2008, Ajan filed a 54-page reply to the government's response [Doc. 324], and, on April 23, 2009, Ajan filed a second motion to supplement his § 2255 petition, [Doc. 336].  The matter is now ripe for disposition.

The Court has determined that the files and records in the case conclusively establish that the petitioner is not entitled to relief under § 2255 as to all issues raised by him, except for the issue he raises pursuant to *United States v. Combs*, 369 F.3d 925 (6th Cir. 2004), on which the Court will receive further briefing as discussed below.  The record likewise establishes that no evidentiary hearing is necessary and Ajan's request for an evidentiary hearing will be DENIED; however, counsel will be appointed to represent Ajan on the issue raised under *Combs*.

This opinion and order will, therefore, dispose of all issues raised by Ajan save the one raised pursuant to *Combs* and, for the reasons which follow, the petitioner's § 2255 motion lacks merit and the motion will be denied in its entirety, except for the single issue raised under *Combs*.  In addition, Ajan's April 23, 2009, motion to supplement will be DENIED.

## I.    Procedural Background

Ajan was indicted by the federal grand jury on July 23, 2002, along with co-

---

[1]  This motion was granted by the Magistrate Judge on November 14, 2007. [Doc. 318].

2

defendants George H. Simpson and John Vance Bowers. Ajan was charged in Count One with conspiracy to distribute and possess with the intent to distribute 5 grams or more of methamphetamine, in Count Two with conspiracy to distribute and possess with the intent to distribute a quantity of methamphetamine (lesser included offense of Count One), in Count Three with possession with the intent to distribute 5 grams or more of methamphetamine, in Count Four with possession with the intent to distribute a quantity of methamphetamine (a lesser included offense of Count Three), in Count Six with distribution of a quantity of a mixture and substance containing a detectable amount of methamphetamine, in Count Seven with brandishing a firearm during and in relation to a drug trafficking offense, in Count Eight with conspiracy to commit kidnapping, in Count Nine with aiding and abetting kidnapping and in Count Ten with aiding and abetting possession of a firearm in furtherance of kidnapping, a crime of violence. [Doc. 1]. On December 19, 2002, a jury found the defendant guilty of Counts One, Three, Six, Seven, Nine and Ten and not guilty as to Count Eight. [Doc. 157].

On April 28, 2003, Ajan was sentenced to terms of imprisonment of 262 months, the bottom of the guidelines range,[2] on the drug and kidnapping offenses, to

---

[2] Because Ajan had a prior felony drug conviction and a prior robbery conviction, he was determined to be a career offender under Chapter 4 of the United States Sentencing Guidelines. With an offense level of 33 and a criminal history category of VI, the resulting guideline range was 262 to 327 months. Petitioner was subject to a consecutive mandatory minimum 384 months on the § 924(c)

3

run concurrently, and a statutory mandatory consecutive 384 months on the § 924(c) convictions (Counts Seven and Ten), for a total sentence of 646 months imprisonment. [Doc. 220]. Ajan's convictions and sentence were affirmed on direct appeal by the Sixth Circuit Court of Appeals on December 15, 2004. *United States v. Simpson*, 116 F. App'x. 736 (6th Cir. 2004). Petitioner then filed a petition for *writ of certiorari* in the United States Supreme Court, which the Court denied on January 24, 2005. *Ajan v. United States*, 543 U.S. 1129 (2005). Petitioner's *pro se* petition for rehearing was denied by the Supreme Court on March 21, 2005. *Ajan v. United States*, 544 U.S. 945 (2005).

Petitioner's § 2255 petition was then timely filed on January 30, 2006.

## II.    Factual Background

The following statement of facts is taken from the government's brief:

> The trial evidence is summarized in part in the court of appeals' decision. *See Simpson*, 116 F. App'x at 738-39. The United States presented the testimony of twenty-two witnesses to establish petitioner's guilt beyond a reasonable doubt. Eric Alford, an officer with the Kingsport, Tennessee, Police Department, testified that he stopped petitioner for suspected drunk driving on November 26, 2000 and, as a result, petitioner was arrested. (R. 184, Trial TR, Eric Alford at 2-18.) A search of petitioner's vehicle incident to his arrest resulted in the seizure of a quantity of white powder in a cigarette pack, digital scales, and a box of baggies. Alford also found a cell phone in the vehicle and called the last number dialed, reaching co-defendant George Simpson. Without

_____

convictions.

4

identifying himself, Alford told Simpson that petitioner Ajan had passed out and needed help. Simpson responded that petitioner was his "boss" and told Alford to bring petitioner to the Coastal Mart on Bloomingdale where Simpson would meet him. Kingsport Officer Mike Hickman was dispatched to the market to meet Simpson. (*Id.*) *See Simpson*, 116 F. App'x at 738.

The white powder found in petitioner's car was analyzed by an employee with the Tennessee Bureau of Investigation Crime Laboratory, who testified that it was 22.2 grams of methamphetamine. (R. 207, Trial TR, Jacob White at 38-41.) DEA Special Agent Mike Steadman testified that, in his opinion, a person simultaneously possessing 22.2 grams of methamphetamine, plastic baggies, and digital scales would be engaged in the distribution of methamphetamine. On cross-examination, Steadman calculated that twenty-two grams of 22% pure methamphetamine would produce 800 dosage units. (R. 163, Trial TR, George Michael Steadman at 2-9.)

Returning to the events of November 26, 2000, Officer Hickman responded to the Coastal Mart at around 10:00 p.m. to meet Simpson. (R. 184, Trial TR, Mike Hickman at 24-30.) In due course, Hickman observed two men wearing camouflage coveralls and bullet proof vests and carrying binoculars and two-way radios. Hickman engaged them in conversation, asked for identification, and one man identified himself as George Simpson. Hickman asked the two men for permission to pat them down, to which they consented. Hickman retrieved a loaded .38 revolver from Simpson. (*Id.* at 24-30.) *See Simpson*, 116 F. App'x at 738.

Two weeks later, on December 8, 2000, Curtis McDavid, Earnest Lynn White, and Ricky Howe met at the Hog Wild Saloon, a bar across the street from the West Side Motel in Kingsport, Tennessee, where White had rented a room for the night. After the bar closed, the three men went to White's motel room to drink a few beers. At about 2:30 a.m., McDavid and Howe left to wait for a taxi, but when it did not come they returned to the room, entering through the sliding glass door. (R. 184, Trial TR, Curtis McDavid at 74-78, 87, 91-92; R. 185, Trial TR, Earnest White at 2-12; Ricky Howe at 71-75.) *See Simpson*, 116 F. App'x at 738.

5

During McDavid and Howe's absence, petitioner and co-defendants Simpson and Bowers had entered White's motel room. When they initially entered the room, petitioner, dressed in black and wearing black gloves, struck White on the head with a walkie-talkie. Petitioner displayed a pistol and demanded $150 from White in payment for a drug debt involving an eightball of methamphetamine. *See Simpson*, 116 F. App'x at 738.

At trial, White explained the facts underlying the methamphetamine debt that he owed petitioner. (R. 185, Trial TR, White at 2-8, 39, 59.) Vance Bowers had introduced White to petitioner and for about three weeks both White and Bowers worked for petitioner in his excavation business, which petitioner operated from his home. There was not much excavation work being done and there were a lot of people who came to petitioner's business who were not excavation customers. Petitioner owed White about $150.00 for three days of work at the excavation business. White testified that three or four days prior to December 9, 2000, petitioner gave White an eight-ball of crystal meth as payment for the hours that White had worked. (*Id.*) However, Officer Melanie Church, the Kingsport Police Officer who interviewed White the morning after his kidnaping, testified that White told her that he had gone to petitioner on December 4, 2000, to get drugs for a friend and that he had been fronted the drugs and would owe petitioner $180 later. (R. 184, Trial TR, Melanie Church at 54.)

When McDavid and Howe reentered White's motel room and encountered petitioner, Bowers, and Simpson, they initially assumed they were in the wrong room. Petitioner ordered them to stay and directed Simpson to display the Tec 9 handgun he was carrying and to place a chair against the door to the hallway so that no one could leave. Petitioner instructed McDavid, Howe, and White at gunpoint to empty their pockets and he robbed them of their cash. *See Simpson*, 116 F. App'x at 738.

Unsatisfied with the amount of cash from the three victims, petitioner forced White to place a telephone call to his mother, Loretta Wogomon, and ask her for $300. Ms. Wogomon thought White was joking until petitioner grabbed the telephone receiver from White and

6

said to Ms. Wogomon, "Ma'am, this is not a joke. . . . You better bring me $300 or I'm going to blow your son's mother f–king head off." (R. 184, Trial TR, McDavid at 74-78, 87, 91-92; R. 185, Trial TR, White at 2-12; Howe at 71-74; R. 208, Trial TR, Loretta Wogomon at 2-9.) *See Simpson*, 116 F. App'x at 738-39.

After the phone call, petitioner and co-defendants Simpson and Bowers forced the three victims out of the motel room and into a car to travel to meet White's mother. Simpson followed in another vehicle, a Chevy Cavalier, and communicated with petitioner using two-way radios. The victims were told that Simpson was following them and that if they made a move they would be shot. The victims were further told that if White's mother did not bring the money then they were going to be killed. (R. 184, Trial TR, McDavid at 78-79; R. 185, Trial TR, White at 12-15, 65; Howe at 75-78). Ms. Wogomon had called the police and did not go to the meeting place. *See Simpson*, 116 F. App'x at 739.

When they were unable to find Wogomon, petitioner, Bowers and the victims, followed by Simpson, stopped at a Coastal market. As petitioner got out of the car, he gave the handgun to Bowers and "told Vance to tell them that if they move, shoot the son of a bitches." Petitioner returned with chips and something to drink. At petitioner's direction, White made another telephone call to his mother but was unable to reach her. They left the market and drove back to the West Side Motel where they saw several police cars in the parking lot. Petitioner started screaming and told the victims, "She f-cked up now . . . . You're a dead mother f-cker," and drove towards Virginia. As they entered Virginia, Bowers commented to petitioner that they were now involved in a federal offense. They stopped at a Texaco Market in Virginia and White tried unsuccessfully to again contact his mother. Simpson pulled in behind petitioner's vehicle and petitioner went over to the Cavalier and talked with him. While petitioner was out of the car, Bowers remained in the car with the gun, guarding White, McDavid, and Howe. Howe testified that he did not try to escape because Bowers had the gun. (R. 184, Trial TR, McDavid at 79-80; R. 185, Trial TR, White at 15-17, 47-48, 65; Howe at TR 75-79, 87-88, 95-96). *See Simpson*, 116 F. App'x at 739.

Petitioner drove the victims to Yuma, Virginia, and pulled over into a secluded area. Simpson parked behind petitioner's vehicle in his red Cavalier. The victims were ordered out of the car and somebody stuck a gun to McDavid's head and ordered him to beat up White or McDavid would be killed. White and McDavid began to fight, as commanded, and during the commotion someone said, "Run!" White and Howe ran in one direction and McDavid in the other, moving up river. White and Howe caught up with McDavid a bit later, and White told McDavid that White had gone to a house to call for help and that a resident had called the police for them. While they were waiting for the police to arrive, petitioner and Bowers drove by and yelled at them, asking if they had called the police yet and yelling that they were "screwed." The police arrived and took the victims back to Tennessee where they were met by a Kingsport Police Officer. (R. 184, Trial TR, McDavid at 80-84; R. 185, Trial TR, White at 12-22, 32; Howe at 71-80, 87-88.) *See Simpson*, 116 F. App'x at 739.

At trial, during McDavid's cross-examination, defendants suggested that McDavid had been having a good time in White's motel room the night of the kidnaping and that McDavid willingly went toVirginia so that he could continue partying. McDavid rejected that version of events, stating,

> Look here, brother, when you got a gun stuck to your head, you ain't doing much thinking about anything but your family and your life, whether you were going to live or you weren't going to live. I don't know if they thought this was a joke, but I didn't think it was a joke; but over $300, it ain't worth nobody losing their life.

Defendants suggested that McDavid had said in another setting that he did not consider himself as having been kidnaped. McDavid replied, "Well, you got a gun pointed on you and you're made to get in the car, so what do you call it?" (R. 184, Trial TR, McDavid at 92-101.)

Harold Blanton of Scott County, Virginia, testified that White had knocked on his door on December 9, 2000. When he answered the door, White said that he needed to use the phone because someone was after

8

him, that they had gotten away, but that one of their friends was still being held. At that point another man (Howe), wearing a short sleeve shirt, came around the corner and told White that they needed to be moving before "they caught back up to them." White was desperate to use the phone, but he and Howe left. Blanton went back inside and called the police. (R. 207, Trial TR, Harold Blanton at 15-22.)

Phillip Lane, Scott County, Virginia, Sheriff's Department, responded to Blanton's call and came to Blanton's residence, where Blanton pointed to three men who were nearby on the road. Lane drove up the road and met the victims as they were crossing the road. The men said that they had been kidnaped in Kingsport, Tennessee. Lane transported White, McDavid, and Howe to Tennessee. (R. 207, Trial TR, Phillip Lane at 29-33.)

Kingsport Police Officer Melanie Church met Lane at the state line on December 9, 2000 and the victims were transferred into her custody. Church testified that the victims told her that they had been taken to Virginia at gunpoint by petitioner, Simpson, and Bowers and that Simpson had used a .9 millimeter during the ordeal. On cross-examination, Church stated that White, McDavid, and Howe had told her the defendants had robbed them of $400, that White had obtained drugs for a friend on December 4, 2000, and that White had been fronted $180 worth of methamphetamine by petitioner. (R. 184, Trial TR, Church at 44-47, 52-54.)

As part of the investigation, Simpson's residence on Shipp Springs Road in Kingsport was searched pursuant to a warrant on December 9, 2000. Detective Frank Lipoma, Sullivan County Sheriff's Department, testified that officers seized guns from the vehicles parked outside the house and additional guns, two-way radios, and a bullet proof vest from inside the residence. (R. 208, Trial TR, Frank Lipoma at 36-44.)

Testimony was presented at trial concerning a recorded telephone call placed on December 7, 2002, by co-defendant Simpson to White while Simpson was incarcerated. As the Court is aware, all telephone calls made from the jail are recorded and the inmates are advised that their calls are being recorded. FBI Agent Rainer Drolshagen testified and

9

explained how he retrieved Simpson's call to White from the jail computer system. Defendants objected to admission of the tape recording on grounds Drolshagen's testimony was insufficient to establish a proper foundation. The Court overruled the objection and the recording of the telephone call was played for the jury. (R. 208, Trial TR, Rainer Drolshagen at 54-65.)

On the tape, Simpson is heard talking to White. Simpson encourages White to avoid being served with a trial subpoena, advising White to hide for about ten days. Simpson tells White that if the victims do not appear for trial, the kidnaping charge will be dropped. (*Id.*) Prior to trial, pursuant to a ruling on petitioner's motion in limine, portions of the conversation were redacted to omit statements by Simpson that "Alan [Ajan] was the main one" and statements that made references to drugs. (R. 144, Magistrate's Pretrial Order.)

Following Drolshagen's testimony, the United States rested. Petitioner presented one witness, Officer Frank Light of the Sullivan County Sheriff's Department. (R. 208, Trial TR, Frank Light, TR 96-97.) Light was called after a juror reported that she had had a conversation with a third party, Estalita Keller, who is petitioner's ex-mother-in-law. As explained in the Court's Order of March 25, 2003, after the conversation occurred between Keller and the juror, the Court interviewed the juror and determined that the conversation was completely innocuous. (R. 198, Order.) Light testified that he knew Keller and that "[a]pparently there's some type of dislike between" petitioner and Keller. (R. 208, Trial TR, Light, TR 96-97.) This testimony was presented to explain to the jury the basis for any possible negative impression Keller may have created regarding petitioner. After Light's very brief testimony, petitioner rested, as did codefendant Simpson. (*Id.*, TR 97.)

Co-defendant Bowers presented testimony by an investigator with Federal Defender Services that victim Curtis McDavid had stated during an interview that he did not feel that he, White, and Howe had been kidnaped. (*Id.*, Charles Brown at 100-01.) David Quillen with the Kingsport Police Department testified that he had examined the motel room where White was staying on the night in question and that there

was no evidence of any violent struggle. (*Id.*, David Quillen at 114-16.) Finally, Bobby Purkey testified that he had conversations with victim White and that the gist of the conversation was that the kidnaping did not happen. (*Id.*, Bobby Purkey at 132-33.) After Purkey testified, co-defendant Bowers rested. (*Id.*, TR 137.) The United States presented no witnesses in rebuttal. (*Id.*)

[Doc. 310, at 2-10]

III. **Standard of Review**

This Court must vacate and set aside petitioner's sentence if it finds that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, . . ." 28 U.S.C. § 2255. Under Rule 4 of the Governing Rules, the Court is to consider initially whether the face of the motion itself, together with the annexed exhibits and prior proceedings in the case, reveal the movant is not entitled to relief. If it plainly appears the movant is not entitled to relief, the court may summarily dismiss the § 2255 motion under Rule 4.

When a defendant files a § 2255 motion, he must set forth facts which entitle him to relief. *Green v. Wingo*, 454 F.2d 52, 53 (6th Cir. 1972); *O'Malley v. United States,* 285 F.2d 733, 735 (6th Cir. 1961). "Conclusions, not substantiated by allegations of fact with some probability of verity, are not sufficient to warrant a hearing." *O'Malley*, 285 F.2d at 735 (citations omitted). A motion that merely states

11

general conclusions of law without substantiating allegations with facts is without legal merit. *Loum v. Underwood*, 262 F.2d 866, 867 (6th Cir. 1959); *United States v. Johnson*, 940 F. Supp. 167, 171 (W.D. Tenn. 1996).

To warrant relief under 28 U.S.C. § 2255 because of constitutional error, the error must be one of constitutional magnitude which had a substantial and injurious effect or influence on the proceedings. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted) (§ 2254 case); *Clemmons v. Sowders*, 34 F. 3d 352, 354 (6th Cir. 1994). *See also United States v. Cappas*, 29 F.3d 1187, 1193 (7th Cir. 1994) (applying *Brecht* to a § 2255 motion). If the sentencing court lacked jurisdiction, then the conviction is void and must be set aside. *Williams v. United States*, 582 F. 2d 1039, 1041 (6th Cir.), *cert. denied*, 439 U.S. 988 (1978). To warrant relief for a non-constitutional error, petitioner must show a fundamental defect in the proceeding that resulted in a complete miscarriage of justice or an egregious error inconsistent with the rudimentary demands of fair procedure. *Reed v. Farley*, 512 U.S. 339, 354 (1994); *Grant v. United States*, 72 F. 3d 503, 506 (6th Cir.), *cert. denied*, 517 U.S. 1200 (1996). In order to obtain collateral relief under § 2255, a petitioner must clear a significantly higher hurdle than would exist on direct appeal. *United States v. Frady*, 456 U.S. 152 (1982).

The Sixth Amendment provides, in pertinent part, "[i]n all criminal

prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel

for his defense." U.S. Const. amend. VI. A defendant has a Sixth Amendment right

not just to counsel, but to "reasonably effective assistance" of counsel. *Strickland v.*

*Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a

two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance
> was deficient. This requires showing that counsel made
> errors so serious that counsel was not functioning as the
> "counsel" guaranteed the defendant by the Sixth
> Amendment. Second, the defendant must show that the
> deficient performance prejudiced the defense. This requires
> showing that counsel's errors were so serious as to deprive
> the defendant of a fair trial, a trial whose result is reliable.
> Unless a defendant makes both showings, it cannot be said
> that the conviction . . . resulted from a breakdown in the
> adversary process that renders the result unreliable.

*Strickland* 466 U.S. at 687. As with any other claim under § 2255, the burden of

proving ineffective assistance of counsel is on the petitioner. *Virgin Islands v.*

*Nicholas*, 759 F. 2d 1073, 1081 (3d Cir. 1985).

In considering the first prong of the test set forth in *Strickland*, the appropriate

measure of attorney performance is "reasonableness under prevailing professional

norms." *Strickland*, 466 U.S. at 688. A defendant asserting a claim of ineffective

assistance of counsel must "identify the acts or omissions of counsel that are alleged

not to have been the result of reasonable professional judgment." *Id.* at 690. The

13

evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong of the *Strickland* test requires the petitioner show counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. The petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The *Strickland* Court emphasized that both prongs must be established in order to meet the claimant's burden, and if either prong is not satisfied the claim must be rejected, stating:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

14

*Id.* at 697.

IV.    **Analysis and Discussion**

A.    **Issue I – Ineffective Assistance of Counsel (IAC)-Search of Defendant's Car**

Ajan was stopped by Kingsport Police Officer Eric Alford ("Alford") on November 26, 2000, for suspected drunk driving and was subsequently arrested. A search of his vehicle incident to arrest resulted in the seizure of a quantity of white powder in a cigarette pack, digital scales and a box of baggies. The white powder was determined by the Tennessee Bureau of Investigation crime laboratory to be 22.2 grams of methamphetamine. Alford also found a cell phone in the vehicle. Alford dialed the last number dialed on the cell phone, reaching co-defendant George Simpson. Without identifying himself, Alford told Simpson that Ajan had passed out and needed help. Simpson told Alford that Ajan was his "boss" and asked him to bring Ajan to the Coastal Mart on Bloomingdale where he would meet them.

The petitioner claims his attorney failed to "properly present [his] Fourth Amendment claims." [Doc. 277 at 5]. Characterizing the search of his car as an "inventory search," Ajan claims that his attorney failed to challenge the search as being in violation of "interdepartmental policy" and was simply a "pretext for gathering evidence." [*Id*. at 5-6]. He also claims that Alford's seizure and use of the

15

cell phone was illegal.

Petitioner's claim lacks merit. His trial counsel filed a motion to suppress, the Magistrate Judge held an evidentiary hearing and filed a Report and Recommendation ("R&R") finding no Fourth Amendment violation, and petitioner's attorney timely objected to the R&R. The District Judge overruled the objection and held that there was no Fourth Amendment violation. Ajan did not raise this issue on direct appeal.

Petitioner cannot show deficient performance by counsel as to this issue. Ajan's argument that the November 26 search was an inventory search which was not conducted according to any established police procedures is completely irrelevant. Notwithstanding Alford's testimony that he "did an inventory of that vehicle," the record establishes that Ajan was properly arrested for drunk driving and that a search of his person revealed two or three bags of pills. When the occupant of a vehicle is lawfully arrested, as Ajan was, the passenger compartment of the vehicle and any containers therein may be searched without a warrant or further showing of probable cause. *New York v. Belton*, 453 U.S. 454 (1981); *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir.), *cert. denied*, 519 U.S. 848 (1996).[3] Even if the vehicle search were not permitted incident to Ajan's arrest, the discovery of pills on his person

_____

[3] The Supreme Court's recent decision in *Arizona v. Gant*, U.S. 556 U.S. ___, 129 S. Ct. 1710 (2009), calls into question the continued viability of *New York v. Belton*; however, Officer Alford had probable cause to search the car for contraband.

16

provided probable cause to search the car for contraband. Whether or not the occupant of a vehicle is arrested, warrantless searches of vehicles are permitted if there is probable cause to believe the vehicle contains evidence of a crime and "exigent circumstances" exist. *Chambers v. Maroney*, 399 U.S. 42, 52 (1970); *Carroll v. United States*, 267 U.S. 132 (1925).

This vehicle "exception" is applicable even in non-exigent circumstances as long as the vehicle is mobile and law enforcement officers have probable cause to believe that it contains incriminating evidence. *Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999); *United States v. Cope*, 312 F.3d 757 (6th Cir. 2002). "Where police have probable cause to believe that a vehicle contains contraband, they may search the entire vehicle and any contents located within it." *United States v. Mans*, 999 F.2d 966, 968 (6th Cir.) , *cert, denied*, 510 U.S. 999 (1993) (marijuana found on driver and cash found under the front seat gave officers probable cause to believe car contained contraband).

It is quite clear that Alford's post-arrest seizure of Ajan's cell phone from his vehicle was also lawful since the seizure resulted from a valid search. Ajan argues, however, that Alford's use of the cell phone was illegal. The Fifth Circuit considered that very question and rejected Ajan's argument in *United States v. Finlee*, 477 F.3d 250 (5th Cir.), *cert. denied*, 127 S. Ct. 2065 (2007). In *Finlee*, the Fifth Circuit held

that since the cell phone was properly seized, the police were "permitted to search [the] cell phone pursuant to [the] arrest." 477 F.3d at 260. *See also United States v. Ortiz*, 84 F.3d 977, 984 (7th Cir. 1996) (upholding retrieval of information from pager as search incident to arrest). There was no deficiency in counsel's performance related to the cell phone and this issue, likewise, lacks merit.

## B. Issue I(a)-IAC-Failure to Object to Recorded Detention Center Telephone Call

Petitioner next asserts that his trial counsel was ineffective for not objecting to the introduction of a recording of a telephone call placed on December 7, 2002, by co-defendant Simpson to Earnest Lynn White, the victim of the kidnaping, while Simpson was incarcerated at the Washington County Detention Center ("WCDC"). All inmate calls from the WCDC are monitored and recorded by the jail computer system. Inmates are advised prior to each call that the call will be recorded.

Prior to trial, Ajan's counsel filed a motion *in limine* in regard to the recording pursuant to *Bruton v. United States*, 391 U.S. 123 (1968). On the recording, Simpson encouraged White to avoid a government trial subpoena and told him the kidnapping charge would be dismissed if the victims did not appear for trial. As a result of petitioner's motion *in limine*, portions of the recording which referred to Ajan were ordered redacted and were not heard by the jury. Ajan now asserts, however, that the recording of inmate telephone calls at the WCDC violates the Electronic

Communications Privacy Act ("ECPA") (codified as amended in scattered sections of 18 U.S.C.), and that his attorney's failure to object to its introduction on this ground constituted ineffective assistance of counsel.

Ajan's position lacks merit for several reasons. First of all, the ECPA is expressly limited to electronic communications as to which a person has an expectation of privacy. *See ACLU v. NSA*, 493 F.3d 644 (6th Cir. 2007). It cannot reasonably be argued that an inmate has any expectation of privacy in a jailhouse phone call where the inmate is expressly warned that the call is subject to monitoring and recording. Secondly, "there is no exclusionary rule generally applicable to statutory violations." *United States v. Abdi*, 463 F.3d 547, 556 (6th Cir. 2006). The Sixth Circuit has specifically held that a violation of the ECPA does not warrant suppression of evidence. *See United States v. Meriweather*, 917 F.2d 955, 960 (6th Cir. 1990) (holding that the act "does not provide an independent statutory remedy of suppression for interception of electronic communications.") Therefore, it was not deficient performance for Ajan's trial counsel not to object to the introduction of the recording at the WCDC on the basis of the ECPA.

Furthermore, even if petitioner could meet the first prong of the *Strickland* test and establish deficient performance on the part of counsel, he cannot establish (and, in fact, does not argue that he can establish) any prejudice from the introduction of the

recording. The trial court granted Ajan's motion *in limine* and all references to Ajan were deleted from the recording and were not heard by the jury.

## C. Issue II-IAC-Fabricated Facts/Evidence

Petitioner argues that counsel was ineffective in failing to argue that a *Franks* hearing was required because of what he refers to as "fabricated facts/evidence" and contradictions in the testimony of several of the officers who testified in the case. Petitioner retreats somewhat from his initial position in his reply to the government's response to his petition. Acknowledging that the initial claim "was drafted by another inmate," Ajan expresses uncertainty "if his argument (i.e. for a *Franks* hearing) was the only course of action my trial counsel Slaughter was obligated to take . . ." [Doc. 15 at 2-3]. The rambling nature of petitioner's pleadings makes it very difficult to ascertain the precise issue being raised here, except that it is clear that petitioner accuses the law enforcement officers involved in the case of making false statements in their affidavits offered in support of their requests for search warrants and of giving perjured testimony at trial.

In order to be entitled to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), commonly referred to as a *Franks* hearing, a defendant must make a "dual showing . . . which incorporates both a subjective and an objective threshold component." *Id*. at 155-56. First, the defendant "must make a substantial preliminary

20

showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Id.* Second, the offending information must be essential to the probable cause determination; if the offending information is excluded and probable cause still remains, a *Franks* hearing is not required. *Id.* A district court must uphold a search warrant if sufficient untainted evidence establishes probable cause. *United States v. Campbell*, 878 F.2d 170, 172 (6th Cir.), *cert. denied*, 493 U.S. 894 (1989).

Ajan specifically points to the affidavit of Officer Glen Cradic ("Cradic"), which was submitted on December 9, 2000, in support of a search warrant for the residence of co-defendant Simpson. Ajan spends many pages of his memorandum discussing perceived false statements of Officer Cradic in the affidavit. Ajan further complains that Cradic's affidavit contains "facts" provided by third parties in violation of *Crawford v. Washington*, 124 S.Ct. 1354 (2004).

Petitioner's arguments about alleged falsehoods in the Cradic affidavit are completely immaterial. The Cradic affidavit was offered in support of a request for a search warrant to search *the residence of co-defendant Simpson*. Petitioner Ajan has absolutely no standing to contest the legality of the search of Simpson's residence. To have standing to challenge the legality of a search under the Fourth Amendment, a defendant must have "a reasonable expectation of privacy" in the place to be

searched.  *Rakas v. Illinois*, 439 U.S. 128, 143 (1978).  Ajan had no reasonable

expectation of privacy in Simpson's residence and thus lacks any standing to

challenge the legality of the search.  As a result, Ajan would not have been entitled to

a *Franks* hearing even if he could have shown false statements in the Cradic affidavit

and counsel was not deficient in failing to seek such a hearing.

One other issue needs to be briefly addressed.  Ajan argues in his reply brief

that the affidavit of Cradic "was incorperated (sic) in Depew's search warrant for

Ajan's home," giving him the required standing to contest the legality of the search.

A review of Officer Depew's affidavit in support of a search warrant for Ajan's

residence at 1747 Goshen Valley Road, Church Hill, Tennessee, establishes that the

affidavit makes no reference to the Cradic affidavit.  Petitioner's argument is wholly

without merit.

Petitioner makes the further argument that the affidavit of complaint filed by

Officer Hickman upon Ajan's arrest for DUI contained "numerous

misrepresentations," that Officer Alford's affidavit of complaint filed in connection

with the arrest of George Simpson on November 27, 2000, contained

"misrepresentations," and that Officer Hickman and Officer Melanie Church both

committed perjury at trial.  He argues that this "fabricated facts/evidence became an

integral part of the federal prosecution.  In particular but not limited to; pretrial

motions filed by all defense counsel, governments responses to motions, open court colloquy at PTC/motion hearing, Magistrates report and recommendation, and Judges orders." [Doc. 15 at 7].

Other than to make conclusory statements about counsel's failure to contest these "fabricated facts," petitioner makes no effort to explain what exactly counsel could , or should, have done differently or how he was prejudiced by counsel's alleged failure.  Such conclusory allegations are insufficient in a § 2255 proceeding. Furthermore, to the extent petitioner is arguing that the evidence against him at trial was insufficient to sustain a conviction, that argument may not be raised in a § 2255 proceeding.  *See Scott v. Morrison*, 58 F. App'x. 602 (6th Cir. 2002) (claim concerning insufficiency of the evidence is not generally cognizable in a habeas proceeding).  As the government correctly points out in its response, petitioner was convicted by a jury after consideration of the trial evidence, petitioner confronted all witnesses against him and his claim lacks either factual or legal basis.

### D.     Issue III-IAC-Chain of Custody

Petitioner argues that his trial counsel was ineffective when he failed to object to the "chain of custody" in relation to methamphetamine that was in Ajan's possession.  Ajan points to testimony of forensic scientist Jacob White and forensic chemistry reports which were introduced at trial.  Petitioner makes no claim that the

officers tampered with or altered the evidence.

Federal Rule of Evidence 901 provides that: "Authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901 Physical evidence is admissible when the possibilities of alteration or misidentification "are eliminated, not absolutely, but as a reasonable probability." *United States v. McFadden*, 458 F.2d 440, 441 (6th Cir. 1972). Where no evidence exists to indicate that tampering with an exhibit occurred, the court presumes public officers have properly discharged their duties. *United States v. Allen*, 106 F.3d 695, 700 (6th Cir.), *cert. denied*, 520 U.S. 1281 (1997) (merely raising the possibility that someone tampered with evidence is insufficient to render evidence inadmissible). "[C]hallenges to the chain of custody go to the weight of the evidence, not its admissibility." *United States v. Levy*, 904 F.2d 1026, 1030 (6th Cir. 1990).

This claim lacks merit as well. The record establishes, and petitioner acknowledges, that his counsel cross examined the government witnesses on the issue and he makes no claim that the evidence was tampered with, raising at most a claim of the mere possibility of tampering. Counsel's performance was in no way deficient and absent evidence of tampering, no basis existed for counsel to object to the admissibility of the methamphetamine. Even were it shown that counsel should have

24

objected, petitioner suffered no prejudice since the evidence was clearly admissible, and any deficiency in the claim of custody went to the weight of evidence only.

### E.    Issue IV-IAC-Multiplicious Counts

Petitioner next alleges that trial counsel was ineffective for failing to raise the "multiciplicity (sic) of Counts 1, 2, 3 and 4 of the indictment in the case." Counts One and Two of the indictment charge Ajan and others with a conspiracy to distribute and to possess with the intent to distribute five grams or more of methamphetamine (Count One) and conspiracy to distribute and to possess with the intent to distribute a quantity of less than five grams of methamphetamine (Count Two). Counts Three and Four each charge possession with intent to distribute methamphetamine (five grams or more-Count Three/a quantity less than five grams-Count Four). The jury was instructed by the Court to consider Counts Two and Four only if they found the defendant not guilty of the charges in Counts One and Three. The jury convicted Ajan on Counts One and Three.

An indictment is multiplicious if it charges a single offense in more than one count. *United States v. Stevens*, 118 F.3d 479 (6th Cir. 1997). A multiple count indictment, however, based on the same underlying conduct, is not multiplicious as long as each count requires proof of an element not required by the other. *United States v. Kelly*, 204 F.3d 652, 656 (6th Cir.), *cert. denied*, 530 U.S. 1268 (2000).

Counts Two and Four of the indictment in this case simply charge lesser included offenses of Counts One and Three. As the Sixth Circuit noted on direct appeal, since Ajan was convicted of Counts One and Three, Counts Two and Four were irrelevant. *Simpson*, 116 F.3d at 739. Since Counts One and Two required proof of a different element (*i.e.* quantity) and Counts Three and Four likewise required proof of a different element (again, quantity) and since Counts Two and Four were charged as alternatives to Counts One and Three, these counts were not multiplicious. Furthermore, even if Counts Two and Four had not been set out as separate counts in the indictment, a lesser included offense instruction would have been given to the jury for Counts One and Three.

Even if Counts Two and Four were multiplicious as to Counts One and Three, Ajan suffered absolutely no prejudice since he was convicted only of Counts One and Three. Not only that, even if the jury had returned verdicts of guilty on all four counts, an option they were not given, the remedy would have been to merge the convictions for sentencing purposes. *See United States v. Throneburg*, 921 F.2d 654, 657 (6th Cir. 1990). This issue lacks merit.

## F.      Issue V-IAC-Petitioner's Failure to Testify

Petitioner alleges that he received constitutionally deficient counsel "when counsel failed to allow petitioner to testify on his behalf." [Doc. 2 at 23]. The

defendant correctly argues that the decision by a defendant to testify or not is personal and the right to testify cannot be waived by defendant's counsel on his behalf. *See Jones v. Barna*, 463 U.S. 745, 751 (1983). In support of his claim, petitioner has submitted the affidavits of his parents, as well as his own affidavit. Ajan's mother states that during the lunch break on either the first or second day of the three day trial, she was told by her son's trial counsel: "Allen wants to testify, but I will not put him on the stand because it would not do him a bit of good and may hurt him." Ajan's father states that "[d]uring the lunch break in the hallway," he was told by his son's attorney: "Allen wants to testify, but I do not want to let him do that for himself, he would only hurt himself." Ajan's own affidavit states that he was "barred from testifying" by his attorney and, if allowed to do so, would have truthfully testified that he "was being railroaded." Both of Ajan's parents saw Ajan and trial counsel in a heated discussion after the government's last witness testified. After presentation of some evidence, however, the defendant's attorney rested defendant's case without calling the defendant to the witness stand to testify.

The defendant's argument has been foreclosed by a recent decision of the Sixth Circuit. In *United States v. Stover,* 474 F.3d 904 (6th Cir. 2007), the Sixth Circuit, quoting *United States v. Webber*, 208 F.3d 545 (6th Cir. 2000), stated:

> Although the ultimate decision whether to testify
> rests with the defendant, when a tactical decision is made

27

not to have the defendant testify, the defendant's assent is presumed. [*United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993) [. . . .]  Barring any statements or actions from the defendant indicating disagreement with counsel or the desire to testify, the trial court is neither required to *sua sponte* address a silent defendant and inquire whether the defendant knowingly and intentionally waived the right to testify, nor insure that the defendant has waived the right on the record.  *Joelson*, 7 F.3d at 177.  *See also United States v. Ortiz*, 82 F.3d 1066, 1069 n.8 (D.C. Cir. 1996) (noting the agreement of the First, Third, Fifth, Seventh, Ninth, Tenth, and Eleventh circuits that the trial court does not have a duty to *sua sponte* conduct an on-the-record colloquy regarding waiver) . . . .

A defendant who wants to testify can reject defense counsel's advise to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel. *Joelson*, 7 F.3d at 177.  At base, a defendant must "alert the trial court" that he desires to testify or if there is a disagreement with defense counsel regarding whether he should take the stand.  *Pelzer [v. United States*, 105 F.3d 659 (table), 1997 WL 12125, at *2 (6th Cir. Jan. 13, 1997) (unpublished)].  When a defendant does not alert the trial court of a disagreement, waiver of the right to testify may be inferred from the defendant's conduct.  Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire to do so.  *Joelson*, 7 F.3d at 177.

*Stover*, 474 F.3d at 908-09, citing *Webber*, 208 F.3d at 551.

This issue is controlled by the Sixth Circuit's holdings in *Stover* and *Webber*.

Because Ajan did nothing to alert the trial court to his desire to testify and because the

trial court was under no duty to inquire, the district court correctly presumed that

defendant Ajan waived his right to testify.  Ajan did nothing before the conclusion of

28

the trial to indicate in any way his disagreement with counsel or his desire to testify.
Under these circumstances, this issue lacks merit.

### G.    IssueVI-IAC-Blakely/Booker Claims

Petitioner claims that his appellate counsel was deficient when he "abandone[ed] petitioner's claim(s) under *Blakely v. Washington*, 124 S. Ct. 2531 (2004) and *Booker v. United States*, 125 S. Ct. 738 (2005)." [Doc. 2, at 25]. More specifically, petitioner contends that his appellate counsel failed to preserve a meritorious *Blakely*/*Booker* issue by not raising the issue in his petition for *writ of certiorari* to the United States Supreme Court.  Ajan relies on *Ballard v. United States*, 400 F.3d 404 (6th Cir. 2005).

Ajan was sentenced by the district court on April 28, 2003.  His appeal to the Sixth Circuit was decided on December 15, 2004.  *See* 116 F. App'x. at 736.  On appeal, Ajan had argued that his sentence was unconstitutional under the Supreme Court's decision in *Blakely*.  The Sixth Circuit disagreed, however, because of its decision in *United States v. Koch*, 383 F.3d 436 (6th Cir. 2004) (*en banc*) which held that the sentencing guidelines were not invalidated by *Blakely*.  Petitioner then, by counsel, filed, on January 10, 2005, a petition for *writ of certiorari* in the United States Supreme Court which did not explicitly raise his *Blakely* issue that the mandatory sentencing guidelines were unconstitutional.  The petition did, however,

29

challenge the district court's fact finding for the purposes of sentencing Ajan as a career offender, citing *Blakely*. On January 12, 2005, the Supreme Court decided *Booker* and, on January 24, 2005, Ajan's petition was denied by the Supreme Court. *Ajan v. United States*, 543 U.S. 1129 (2005). On February 12, 2005, the petitioner filed a *pro se* petition for rehearing of the order denying his petition for *writ of certiorari* and specifically seeking a remand of his case in light of *Booker*. The Supreme Court denied the *pro se* petition for rehearing on March 21, 2005. *Ajan v. United States*, 544 U.S. 945 (2005).

Meanwhile, Ajan's co-defendants, Simpson and Bowers, had each petitioned the Supreme Court for a *writ of certiorari* and argued that the sentencing guidelines were unconstitutional. Simpson's petition was granted on February 28, 2005, and his case remanded to the Sixth Circuit for further consideration in light of *Booker*. *Simpson v. United States*, 543 U.S. 1182 (2005). On June 13, 2005, Bowers' petition was likewise granted. *Bowers v. United States*, 544 U.S. 995 (2005). After Bowers' and Simpson's cases were remanded to the district court for resentencing, Bowers was sentenced to 156 months of imprisonment and Simpson was sentenced to 432 months of imprisonment.[4] This represented a reduction from the original pre-*Booker* sentences for Bowers and Simpson of 55 months and 49 months respectively.

---

[4] Simpson also received an 18 month consecutive sentence on an escape conviction resulting from his escape from custody while his appeal was pending.

In *Ballard*, a panel of the Sixth Circuit considered whether a defendant received ineffective assistance of appellate counsel due to the failure of her attorney to raise issues related to *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *United States v. Dale*, 178 F.3d 429 (6th Cir. 1999) on direct appeal. While neither *Apprendi* nor *Dale* had been decided at the time of Ballard's trial, both were decided while Ballard's case was on direct appeal. The Sixth Circuit, while noting that it is not required that attorneys "foresee changes in the law," nevertheless found that, once "an important and relevant change does come about, we do expect counsel to be aware of it." *Ballard*, 430 F.3d at 408 (citing *Johnson v. United States*, 520 U.S. 461, 468 (1997)). The Sixth Circuit held, applying a plain error standard of review, that appellate counsel prejudices a client where the attorney fails to raise a meritorious claim on direct appeal where the error would have altered the outcome of the appeal. *Id.* at 409.

The government directs the Court's attention to the Sixth Circuit's unreported decision in *United States v. Burgess*, 142 F. App'x 232 (6th Cir. 2005). Burgess was convicted in the district court and sentenced under the mandatory guidelines scheme pursuant to a plea agreement which included a waiver of his right to take a direct appeal. In an attempt to evade the appellate waiver, Burgess argued on direct appeal that he did not enter the plea agreement knowingly, voluntarily and intelligently, and that the district court failed to comply with the requirements of Federal Rule of

Criminal Procedure 11. While the direct appeal was pending, the United States

Supreme Court decided *Booker*. In a supplemental *pro se* brief, Burgess argued that

his trial counsel was constitutionally ineffective by not anticipating the *Booker*

decision based on the court's previous decisions in *Apprendi* and *Blakely*.

Although normally declining to review an ineffective assistance of counsel

claim on direct appeal, the Sixth Circuit found the normal concerns about premature

ineffective assistance claims to be absent in Burgess' case. The Sixth Circuit said:

> Burgess's trial counsel cannot be deemed ineffective for
> failing to anticipate the Supreme Court's June 24, 2004
> holding in *Blakely* that the Sixth Amendment precluded the
> imposition of a sentence under Washington state's
> sentencing system based on facts not found by a jury or
> admitted by the defendant. *See Blakely*, 124 S. Ct. at 2537-
> 38 (applying *Apprendi*). The Supreme Court had not even
> agreed to hear the appeal in *Blakely* until over a month after
> Burgess' sentencing. *See Blakely v. Washington*, 540 U.S.
> 965, 124 S.Ct. 429, 157 L.Ed. 2d 309 (October 20, 2003).
> Nor can counsel be deemed ineffective for lacking the
> addition prescience to anticipate that the eventual holding
> in *Blakely* would lead to the Supreme Court's January 12,
> 2005 decision in Booker to remedy potential Sixth
> Amendment problems in the application of the Federal
> Sentencing Guidelines by declaring the guidelines advisory
> only, *Booker*, 125 S.Ct. at 764-67, particularly because the
> *Blakely* opinion makes clear that it expresses no opinion on
> the continuing validity of the federal guidelines, *Blakely*,
> 124 S.Ct. at 2538 n.9.

*Burgess*, 142 F. App'x at 240. The Sixth Circuit further stated:

> In the end, the merits of Burgess's ineffective assistance of

counsel claim hinges on showing that his counsel acted unreasonably in failing to predict two supreme court decisions (*Blakely* and *Booker*) and a subsequent decision from this circuit (*Barnett*). As a matter of law there simply is no basis for Burgess' assertion that his counsel's failure to predict this novel line of authority "failed below an objective standard of reasonableness."

*Id.* at 241.

A different panel of the Sixth Circuit just this past year considered a factual scenario more closely akin to Ajan's than either *Ballard* or *Burgess*. In *Nichols v. United States*, 501 F.3d 542 (6th Cir. 2008), reh'g *en banc* granted, opinion vacated (January 3, 2008), the defendant and a co-defendant were convicted in 2002 on bank extortion and firearm charges and Nichols was sentenced to 405 months imprisonment under the mandatory sentencing guidelines. Nichols appealed, but challenged only the district court's jury instructions. Nichols' conviction was affirmed on direct appeal and no petition for *writ of certiorari* was filed. His co-defendant, however, did petition for *certiorari*, arguing that his sentence was improper because of *Blakel*y. On January 12, 2005, the Supreme Court decided *Booker* and the co-defendant's petition for *certiorari* was granted and his case remanded for resentencing. The co-defendant ultimately received a sentence nine months less than his pre-*Booker* sentence.

Nichols then filed a motion to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255. He argued that he received constitutionally ineffective assistance

33

of counsel because his attorney failed to argue that mandatory guidelines violated the Sixth Amendment based on *Apprendi.* The panel held that "adequate counsel would have filed a petition for *writ of certiorari*" to preserve the Sixth Amendment challenge on appeal and found prejudice to Nichols in the experience of his co-defendant, who received a sentence that was nine months less than his original sentence on remand. *Nichols*, 501 F.3d at 547-48.

Because the issue in *Nichols* is very similar to the issue raised by Ajan, this Court deferred ruling on Ajan's claim until the *en banc* Sixth Circuit rendered a decision, which it did on April 29, 2009. The *en banc* opinion forecloses Ajan's argument that his appellate counsel was constitutionally ineffective in failing to preserve the *Booker* issue in the petition for *writ of certiorari*. Judge Batchelder, writing for an 11-5 majority of the full court, declined to address the "broader constitutional question" of whether a criminal defense attorney is ineffective "by failing to preserve a future-change-in-the-law argument in the hope that the Supreme Court will strike down the existing law while that defendant's case is still pending on direct appeal" and found that "[b]ecause defendants are not constitutionally entitled to the assistance of counsel in preparing petitions for *certiorari*," Nichols could not have been prejudiced by the failure of appellate counsel to file a petition for *certiorari*. *Nichols v. United States*, 563 F.3d 240 (6th Cir. 2009).

The Court noted that there exists a "sharp line of demarcation" on the continuum from sentencing to appeal, "before which a defendant *has* a constitutional right to counsel and after which that same defendant does not." *Id*. at 247-248. "[W]here there is no constitutional right to counsel there can be no deprivation of effective assistance." *Id*. at 248 (quoting *Coleman v. Thompson*, 501 U.S. 722, 752 (1991)). Because there is no constitutional right which entitles a criminal defendant to the assistance of counsel for the filing of a petition for *certiorari*, the Sixth Circuit held, Nichols could not show that counsel's failure to file that petition amounts to constitutionally ineffective assistance of counsel. *Id.* at 249-50.

*Nichols* is indistinguishable from the present case except for one immaterial difference. In Ajan's case, counsel filed the petition for *certiorari*; he simply did not include the Sixth Amendment issue resolved by *Booker*. The failure to include the *Booker* issue in the petition for *certiorari* is equivalent to not filing the petition at all with respect to that issue. In any event, because Ajan had no constitutional right to the assistance of counsel in the filing of his petition for *certiorari*, an alleged error by counsel in the filing of that petition does not raise a constitutional claim and is thus not cognizable under § 2255.[5] Because Ajan's only claim of prejudice "hangs on his

---

[5]    As noted in *Nichols*, Sixth Circuit Rules 101(a) and (g), which require losing appellate counsel to petition for *certiorari* under certain circumstances, do not compel a different result. The Circuit's procedural rules do not create a constitutional right or impose a constitutional duty on counsel. *Nichols*, 563 F.3d at 250.

inability to receive the benefit of *Booker* (the benefit that co-defendants [Simpson and Bowers] *did* receive in the form of a post-*Booker* re-sentencing and a [] sentencing reduction)," *Id*. at 251, he can likewise establish no prejudice because, even though his co-defendants were successful in achieving a remand of their cases for resentencing after *Booker*, that is not dispositive and "improperly turn[s] on the type of hindsight discouraged by *Strickland*." *Id*. at 252 fn. 8 (quoting *Range v. United States*, 25 F.3d 1049 (table), 1994 WL 252643, at * 4 (6th Cir. June 9, 1994)). This issue, therefore, lacks merit.

### H. Motion to Supplement

On April 23, 2009,[6] more than three years after the filing of Ajan's § 2255 petition and more than four years after the denial of his petition for *certiorari* by the Supreme Court, Ajan has filed a "Motion to Supplement" his § 2255 petition. That motion, [Doc. 336], is denied as untimely.

The Antiterrorism and Effective Death Penalty Act of 1996 established a one-year statute of limitations for motions to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255. The limitation period for the filing of a § 2255 petition by Ajan began to run when his judgment of conviction became final on January 24, 2005, the

---

[6] The envelope used to mail this motion indicates that the motion was mailed from zip code 47802 on April 21, 2009. The motion was mailed directly to the chambers of the United States District Judge assigned to this case and the envelope indicates that the package was x-rayed by court security personnel on April 23, 2009, the same date it was docketed by the clerk.

36

date the United States Supreme Court denied his petition for *writ of certiorari*.[7]  The

original § 2255 motion was timely filed.  The motion to supplement is untimely unless

it falls within the exception of 28 U.S.C. § 2255(f)(4) which provides that the one-

year statute of limitations begins to run on "the date on which the facts supporting the

claim or claims presented could have been discovered through the exercise of due

diligence," or, because the attempted amendment "relates back" to the original filing.

Ajan's motion to supplement contains an allegation that the United States

District Judge who presided over his trial, now deceased, was suffering from

Alzheimer's disease at the time of the trial.  Ajan claims he was apprised of that "fact"

by his appellate attorney, "who professed a belief that [the trial judge] should not have

been presiding over the criminal trial due to suffering from Alzheimer's." [Doc. 336

at 1].  He further claims that his appellate attorney told him the issue "could not be

raised as an issue, in the petitioner's direct appeal, because the judge was 'too well

respected.'" *Id*.  Ajan cannot show, therefore, that he has exercised due diligence in

the presentation of his claim and offers no explanation for his delay of more than four

years in the filing of his claim.

Ajan's filing, likewise, does not relate back, thereby allowing him to escape the

---

[7]  Ajan's petition pursuant to § 2255 was filed on January 30, 2006; however, it appears the
petition was delivered to prison authorities for mailing on January 23, 2006.  Under the "Mailbox" rule,
January 23, 2006, is considered the date of filing.

one-year time limit. In 2005, the Supreme Court very significantly restricted application of Federal Rule of Civil Procedure 15(c)(2) in the § 2255 context when it held that a claim in an amended petition does not relate back to the original date of filing under Rule 15(c)(2) when it asserts a new ground for relief supported by facts that differ in both time and type from those set forth in the original proceeding. *Mayle v. Felix*, 545 U.S. 644 (2005). The relation back doctrine will apply only to newly added claims which "ar[i]se out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading," *Id*. at 656, and have a common "'core of operative facts' uniting the original and newly asserted claims." *Id*. at 659.

Even if Ajan's amendment could be considered timely, it lacks any merit whatsoever. Ajan has cobbled together a collection of hearsay, supposition and fanciful visions of conspiracy between the Assistant United States Attorney who tried the case, the federal and state law enforcement officers involved in the case, and the trial judge, to support his argument. Because he did not raise the issue before the trial court or on appeal, he has procedurally defaulted the claim, even if it were timely, and he must show both cause and prejudice for his failure to raise the claim. The only argument Ajan makes to potentially excuse his failure to raise the issue before the trial court or on direct appeal is that his appointed attorney advised him that he could not be successful on appeal because the trial judge was "too well respected." He also

38

argues, unpersuasively, that he had no confirmation of the trial judge's "disability" until he heard news reports of the judge's death on July 31, 2008, "following a lengthy illness with Alzheimer Disease." These allegations do not establish cause for his failure to raise the claim earlier.

Ajan clearly knew of the claim while his case was still pending in the trial court and a review of the more than 150 page motion to supplement and attached exhibits clearly reveals that his attorney's advice not to raise the issue on direct appeal was sound advice and falls far short of raising a claim of constitutional magnitude. It is also significant that Ajan does not characterize his appellate attorney's advice as deficient and identifies no acts or omissions of counsel "that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

More fundamentally, however, Ajan cannot show any prejudice from counsel's performance on this issue. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. Even accepting all of Ajan's allegations as true, those allegations do not support the conclusion he draws. For instance, Ajan points to the fact that the trial judge took "senior status" on October 1, 2002, as evidence that he should not have presided over Ajan's trial which began on December 17, 2002, and that since "[n]o explanation was ever offered," the trial judge's senior

status must necessarily have been related somehow to some sort of disability. No such conclusion can be drawn. 28 U.S.C. § 371 authorizes a district court judge to take senior status whenever the judge's years of service and age total 80 and the judge is at least 65 years of age. Disability is not a prerequisite to senior status. *Id*. In fact, the trial judge assigned to Ajan's case continued to handle cases filed in the Northeastern Division of this Court until his retirement in April, 2007. Ajan further claims, in retrospect, that the trial judge exhibited memory lapses, impaired hearing, confusion, impatience, hostility and bias toward the defendants and made incorrect or "irrational" evidentiary rulings during the trial–all of which he now associates with some sort of mental disability based upon his "review[] and research[] " of medical literature.[8]

Ajan also makes the outrageous claim that the trial judge was part of some conspiracy with the AUSA who represented the government in the case to "fabricate facts," a conclusory statement he pleads absolutely no facts to support. The major problem for Ajan is that he cannot establish that any of the alleged instances of misconduct had any affect on the outcome of his trial. The evidence was clearly sufficient for the jury convict, none of the alleged errors were raised on appeal, and, in fact,  this Court's review of the transcript pages attached to Ajan's motion reveals

---

[8]   He also cites the testimony of Justice Sandra Day O'Connor before a congressional committee about symptoms associated with Alzheimer's disease.

no error in the trial judge's rulings or behavior during the trial. Even if there were

some technical error in some of the trial judge's rulings and actions, those errors were,

without doubt, harmless and there is no doubt that, absent the alleged errors, the result

would have been the same.

## I.    The Sole Remaining Claim/Count-Ten/Non-Existent Offense

Count Ten of the indictment charged Ajan with a violation of Title 18 U.S.C.

§ 924(c)(1), as follows:

> The Grand Jury charges that on or about December 9, 2000,
> in the Eastern District of Tennessee, and elsewhere, the
> defendants, Allen Mark Ajan, George Hubert Simpson, and
> Vance Bowers, aided and abetted by each other, did
> knowingly and intentionally possess a firearm, during and
> in relation to a crime of violence, to wit: The kidnapping of
> Earnest White, Ricky Howe, and Curtis McDavid.

Section 924(c)(1) makes it a crime offense for "any person who, during and in

relation to any crime of violence or drug trafficking crime . . . for which the person

may be prosecuted in a court of the United States, uses or carries a firearm, or who,

in furtherance of any such crime, possesses a firearm . . . . 18 U.S.C. § 924(c)(1)(A).

Ajan now contends that "as a consequence of 'intervening change in law,' in

the Circuit, that Count Ten of the second superceding Indictment must be dismissed."

More specifically, Ajan contends that Count Ten fails to charge him with a federal

offense and that the Court, therefore, lacked subject matter jurisdiction as to Count

41

Ten in light of the Sixth Circuit's intervening decision in *United States v. Combs*, 369 F. 3d 925 (6th Cir. 2004).

In *Combs*, the defendant was charged and convicted of two § 924(c) violations. One of the counts charged Combs with possession of firearms "in furtherance of a drug trafficking crime" and the other charged that Combs possessed a firearm "during and in relation to a drug trafficking crime." In reversing both convictions, the Sixth Circuit held that § 924(c) criminalizes two distinct offenses–"(1) *using or carrying* a firearm *during and in relation to* a drug trafficking crime, and (2) *possessing* a firearm *in furtherance of* a drug trafficking crime." *Combs*, 369 F.3d at 931. Citing *Bailey v. United States*, 516 U.S. 137, 143 (1995), the court noted that "use" of a firearm connotes "more than mere possession of a firearm" and requires some active employment of the firearm by the defendant. *Id*. at 932 (quoting *Bailey*, 516 U.S. at 143). To "carry" a firearm means "the firearm must be on the person, as when 'a person . . . knowingly possesses and conveys firearms in a vehicle, including in the locked glove compartment or trunk of a car . . . .'" *Id*. The Sixth Circuit has determined that, for a "carrying" offense, "the firearm need not be immediately available for use and that the proper inquiry [in determining whether a firearm is being 'carried'] is physical transportation of the firearm." *Id*. at 933 (citing *Hillard v.*

42

*United States*, 157 F.3d 444, 449 (6ᵗʰ Cir. 1998)). The "during and in relation to" element requires that the firearm "furthered the purpose or effect of the crime and its presence or involvement was not the result of coincidence." *Id.* (quoting United *States v. Warwick*, 167 F.3d 965, 971 (6ᵗʰ Cir. 1999)).

The indictment in this case, as in *Combs*, charged the defendant with possessing a firearm, during and in relation to, a crime of violence, utilizing one element from each of the two distinct § 924(c) offenses. This, as the Sixth Circuit found, resulted in the defendant not being charged "with *any* codified federal crime." Thus, had Ajan or his co-defendants raised this issue on direct appeal, the claim would have resulted, as it did in *Combs*, with reversal and remand for a new trial on the § 924(c) charge.

While seeming to acknowledge that Ajan's argument would have had merit if it had been raised on direct appeal, the government argues that, because it was not, however, raised on direct appeal, the claim has been procedurally defaulted. A claim is procedurally defaulted when it is raised for the first time on collateral review and no contemporaneous objection was made nor was the issue raised on direct appeal. *United States v. Frady*, 456 U.S. 152, 167-68 (1982). Where a petitioner has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in a motion under § 2255 only if the petitioner first demonstrates either cause

for the default and actual prejudice or that he is actually innocent. *Bousley v. United States*, 523 U.S. 614, 622 (1998). The government argues, therefore, that Ajan must show actual prejudice before he can prevail in this § 2255 proceeding, and the government may be correct. However, Ajan on the other hand, citing *United States v. Adesida*, 129 F.3d 846 (6th Cir. 1997), contends that he has not procedurally defaulted his *Combs* claim, even though the argument was not raised on direct appeal. In short, he argues that, because the indictment did not charge a cognizable federal offense in Count Ten, the district court lacked subject matter jurisdiction to try him for the alleged violation of the law. He argues that lack of subject matter jurisdiction may be raised at any time, including during a proceeding under 28 U.S.C. § 2255, citing *United States v. Harper*, 901 F.2d 471, 472 (5th Cir. 1990).

Because Ajan raises a substantial issue with respect to this claim, and because the filings of the parties do not adequately address the many issues which are raised in relation to this claim, and, in the interest of justice, the Court will appoint counsel to represent Ajan as to this claim only. Therefore, it is hereby ORDERED that Jerry Laughlin, Esquire, is appointed to represent the petitioner in this pro se motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 with respect to the issue he has raised pursuant to *United States v. Combs*. Counsel will have sixty

44

(60) days from the date hereof to contact the movant and to file a brief in support of the movant's position with respect to his *Combs* claim. The petitioner's present address is as follows:

> Allen Mark Ajan
> # 20109-074
> United States Penitentiary
> P. O. Box 33
> Terra Haute, IN 47808
> (812) 244 - 4400

Likewise, the government may file a supplemental brief within sixty days of the entry of this order. Although the Court has found that Ajan's § 2255 petition should be dismissed as to all claims except the claim raised pursuant to *United States v. Combs*, on which the Court will reserve decision pending receipt of additional briefing from the parties, the Court will not enter judgment at this time nor address whether a certificate of appealability should be issued to the petitioner.

## V.     Conclusion

For the reasons set forth herein, the petitioner's § 2255 motion lacks merit as to all issues except for the issue raised pursuant to *United States v. Combs*, on which the Court will receive further briefing and will reserve decision, and the petitioner's petition will be dismissed as to those claims. Once the issue raised by the petitioner pursuant to *United States v. Combs* is decided by this Court, the Court will then enter

an appropriate judgment and will address whether petitioner should be granted a certificate of appealability on any issues in this case.

So ordered.

ENTER:

s/J. RONNIE GREER<br>UNITED STATES DISTRICT JUDGE